1998 ME 127

**Susan DECHERT, Individually and as Next Friend of Candice Dechert**

**v.**

**MAINE INSURANCE GUARANTY ASSOCIATION.**

Supreme Judicial Court of Maine.

Submitted on Briefs Nov. 24, 1997.

Decided May 28, 1998.

207 Neb. 35, 295 N.W.2d 688, 693 (1980); *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 893 (Tex.1991).

William M. Avantaggio, Howard & Bowie, Damariscotta, John E. Harrington, Jr., Samuel Nesbitt, Jr., Winterport, for plaintiff.

James E. Fortin, Martica S. Douglas, Douglas, Denham & Rogers, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, LIPEZ, and SAUFLEY, JJ.

ROBERTS, Justice.

[¶ 1] Susan Dechert appeals from the summary judgment entered in the Superior Court (Hancock County, *Marsano, J.*) in favor of Maine Insurance Guaranty Association. Dechert contends that the court erred in its determination that Irving Farrin was not an "insured" under his father's homeowner's policy with Maine Insurance and in its determination that the term "household" is not ambiguous. We vacate the judgment.

[¶ 2] In 1980 Eugene Farrin, Irving's father, acquired a trailer home located a few miles from his primary residence in Bar Harbor. He subsequently added the trailer home to his homeowner's insurance policy with American Universal Insurance Company, Maine Insurance's predecessor, for liability coverage as an "other insured location."[1] In 1983 or 1984, Irving moved back into his parents' home in Bar Harbor. At the time, Irving had separated from his second wife and had fallen on bad times financially. After living with his parents for a few months, he moved into the trailer home. His decision to move out of his parents' home was influenced by his desire to have his two sons, Craig and James, live with him during their summer vacation. His parents did not charge him rent to live in the trailer home, but Irving was responsible for buying his own food and paying for the utilities. Although Irving was employed when he moved into the trailer home, his parents still helped him financially by occasionally paying for his utilities and helping him buy a car. After August 1984 Irving returned to his parents' home for a short time and then moved to an apartment.

[¶ 3] In August 1984 Irving and Dechert left his elder son, Craig, to baby-sit his brother, James, and Dechert's daughter, Candice, in the trailer. As the children were playing in Irving's bedroom, Craig accidentally shot Candice with a rifle that Irving had left in the bedroom. In December 1994 Dechert sought a declaratory judgment that Maine Insurance was obligated to settle her claims because the policy covered damages

resulting from the negligence of either Irving or Craig. In March 1996 Maine Insurance filed a motion for a summary judgment, contending that Dechert's complaint should be denied because neither Irving nor Craig were insureds under the policy. The court granted the motion, holding that the term "household" was not ambiguous and that Irving was not an insured under the policy. This appeal followed.

[¶ 4] Whether the terms of a contract are ambiguous is a question of law. *Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 384 (Me. 1989). That question, however, cannot be resolved in a vacuum. To interpret the meaning of words, a court needs to know what question it is asked to answer. *See Cambridge Mut. Fire Ins. Co. v. Vallee,* 687 A.2d 956, 957 (Me.1996) ("residence" has different shades of meaning depending on the context in which it is used); *Workman v. Detroit Auto. Inter–Ins. Exch.,* 404 Mich. 477, 274 N.W.2d 373, 379 (1979) ("resident of an insured's household" has no absolute meaning and may vary according to circumstances).

[¶ 5] There is no dispute that Irving is the son of Eugene and is a relative of the policyholder. Our focus therefore is on the question whether Irving was a resident of Eugene's household. Because we find the words ambiguous in the circumstances of this case and because they are words of inclusion of persons covered, we interpret the words liberally to the extent they can reasonably provide coverage to Irving.

[¶ 6] Usually, the term household refers to "a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a 'collective body of persons living together, within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interest and social happiness.' " *Leteff v. Maryland Cas. Co.,* 91 So.2d 123, 130 (La.Ct. App.1956). Not all of these elements are essential, however, in a given case. For

---

1. Eugene's homeowner's policy provides coverage for damages for which the insured is legally liable. The policy defined "insured" as follows:

3. "insured" means you and residents of your household who are:
 a. your relatives....

example, a temporary absence may not terminate the status of resident in the household, and much will depend on the subjective or declared intent of the individual. Nor is it essential that the household be housed under a single roof or supported by a single head.

[¶ 7] Two cases will illustrate the fact-specific nature of the determination. In *Brown v. Trahan*, 526 So.2d 1216 (La.Ct.App.1988), the named insured acquired insurance on two houses he owned. He resided in one of the houses with his second wife. His stepson resided in the other. His stepson paid nominal rent, paid his own utility bills, and brought his own appliances and furnishings when he moved into the house. When the stepson became delinquent on several rental payments, the named insured, however, did not seek eviction. Brown, who was accidentally shot by the stepson, brought an action to recover damages and medical expenses from the stepfather's insurer. The court stated that the fact that both houses were insured under the same policy had no bearing on the status of the stepson. The court acknowledged that a determination of this issue did not rest solely on whether the stepson lived under the same roof as his mother and stepfather. It instead focused on his attachment to them. In holding that he was not a member of his mother's household, the court noted that he had no personal belongings at his mother's house, that he did not have a key to her house, and that he was not "free to come and go therefrom as he pleased." *Id.* at 1219.

[¶ 8] In *Row v. United Servs. Auto Ass'n*, 474 So.2d 348 (Fla.Ct.App.1985), the court held that a son with a separate apartment in an apartment complex owned by his father was a member of his father's household. His father resided in a different apartment in the complex. The son suffered from continued mental disturbances and did not pay rent or maintain utility services in his apartment. He would use his father's apartment for "socializing, eating and cooking, using the telephone, doing laundry, and bathing." *Id.* at 350. The court noted that "[a]ll the evidence points to the conclusion that [the father] continued to be responsible for [his son] both financially and emotionally and to provide support normally accorded a dependent member of his household." *Id.* at 351.

 [¶ 9] There is no question Irving was a resident in his parents' household in the spring of 1984. When, if ever, he ceased to be a resident in the household depends on a factual determination influenced by such questions as: What was Irving's subjective or declared intent when he moved to the trailer? What was the nature of his tenancy? What, if any, belongings did Irving leave with his parents? What was Irving's practice in regard to returning home? Did Irving retain a key? What was the extent of Irving's financial dependency on his parents? "[N]o one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others." *Workman v. Detroit Auto. Inter–Ins. Exch.*, 274 N.W.2d at 379. Critical to the weighing process is the necessity of evaluating the credibility of the witnesses. *See VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me.1996).

The entry is:

Judgment vacated. Remanded for further proceedings consistent with this opinion.